(163 App. Div. 423)

### LAZINSK v. CITY OF NEW YORK. (No. 5929.)

(Supreme Court, Appellate Division, First Department. July 10, 1914.)

1. MUNICIPAL CORPORATIONS (§ 220\*)—EMPLOYÉS—SALARIES—PRESUMPTIONS.
    Under Greater New York Charter, § 56 (Laws 1901, c. 466), as amended by Laws 1902, c. 435, requiring the board of aldermen, on the recommendation of the board of estimate and apportionment, to fix the salary of every person whose compensation is to be paid out of the city treasury, section 1543, declaring that the salaries shall be as fixed by the board of aldermen on the recommendation of the board of estimate and

---

apportionment, section 1542, prohibiting heads of departments and boards from incurring obligations in excess of the amount appropriated, and section 226, providing for the preparation of the budget by the board of estimate and apportionment and the adoption thereof by the board of aldermen, an employé as a structural steel draughtsman in the department of bridges, at an annual salary of $1,800, appointed several years after the fixing by the board of aldermen of salaries of draughtsmen at $1,950 per year, who receipts for his salary as prescribed by section 149, is presumptively entitled only to a salary of $1,800 on the theory that there has been a reduction by the board of estimate and apportionment and board of aldermen, and he cannot thereafter recover any additional salary, and the court must adjudge that the only manner in which the salary was fixed was by annual estimates or other provision for the payment thereof at $1,800 per annum.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 599–608; Dec. Dig. § 220.*]

2. MUNICIPAL CORPORATIONS (§ 220*)—OFFICERS—SALARIES.

Though under Greater New York Charter (Laws 1901, c. 466) the action of the board of aldermen in passing on the annual estimates of the board of estimate and apportionment is not legislative, and though the board of estimate and apportionment and the board of aldermen must provide in the annual estimates for compensation of employés, they are not confined to any particular procedure in refixing salaries, and they may, by annual estimates, reduce salaries which it was within their province to fix.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 599–608; Dec. Dig. § 220.*]

3. MUNICIPAL CORPORATIONS (§ 220*)—OFFICERS—SALARIES—REDUCTION.

Though a formal resolution reducing salaries of employés is necessary under Greater New York Charter (Laws 1901, c. 466), an employé who accepts and receipts for a reduced salary based on the recommendation of the board of estimate and apportionment and the approval of the board of aldermen may not compel the city to pay the additional salary.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 599–608; Dec. Dig. § 220.*]

Appeal from Appellate Term, First Department.

Action by Abram Lazinsk against the City of New York. From a determination of the Appellate Term affirming a judgment of the Municipal Court for plaintiff, defendant appeals. Reversed, and complaint dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Clarence L. Barber, of New York City (Terence Farley, of New York City, on the brief), for appellant.

Louis Marshall, of New York City (Herman Asher and Herman Gettner, both of New York City, on the brief), for respondent.

LAUGHLIN, J. On the 1st day of May, 1907, the plaintiff was appointed by the commissioners of bridges, by a formal letter of appointment, as "structural steel draughtsman" in the department of bridges, and his compensation was specified in the letter of appointment as being $1,800 per annum. He accepted the employment and served in that capacity until the 28th day of February, 1910, receiving and receipting for compensation without protest at the rate fixed in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the letter of appointment, and was then suspended pursuant to the provisions of section 1543 of the Greater New York Charter for "lack of work." He was reassigned or reappointed to duty in the same capacity on the 16th day of October, 1911, and served therein and received and receipted for compensation at said rate without protest until the 25th day of April, 1912, when he filed a claim with the comptroller for the difference between the compensation he had received and salary at the rate of $1,950 per annum from the time of his original appointment with the exception of the period of his suspension as aforesaid. His claim is based upon a resolution of the board of aldermen adopted on the 2d day of June, 1903, and approved by the mayor on the 9th day of the same month, fixing the salary of "draughtsman" in the department of bridges at $1,950 per annum. The claim was disallowed, and this action was brought to recover the difference between the compensation received and the amount so claimed, which was stipulated to be $500.

[1] The resolution fixing the salary of "draughtsman" at $1,950 per annum has never been formally repealed or modified, and plaintiff was not aware of it until the "early part of 1912." It was stipulated that the board of aldermen never passed any resolution fixing the salary for the position of "structural steel draughtsman"—the position specified in plaintiff's appointment in the department of bridges during the time covered by plaintiff's claim.

At the time the board of aldermen fixed the salary of "draughtsman" in the department of bridges, as stated, it also by the same resolution fixed the salaries of the positions of "secretary to the commissioner," "auditor," "chief clerk," "bookkeeper," and "clerk," and "topographical draughtsman." The salary of the last-named position was fixed at $1,800 per annum. When that resolution was adopted, there were in the department of bridges two draughtsmen named King and Lingerman, each receiving a salary of $1,800 per annum, which was fixed expressly for them by name by a resolution of the board of estimate duly adopted on the 30th day of April, 1902, and one topographical draughtsman, named Jackson, receiving a salary of $1,500 per annum. The two draughtsmen retained that title, and one of them remained in the service under that title long after plaintiff was appointed. Prior to the adoption of the resolution of June 2, 1903, and on the 27th day of April, 1903, the commissioner of bridges wrote to the board of estimate and apportionment requesting the adoption of resolutions by said board and by the board of aldermen establishing, among others, the grade of "draughtsman, per annum * * * $1,950," for the reason, as stated in the letter, that the commissioner desired "to make some well-earned promotions among the employés in the main office of this department"; and on the same day he wrote the same board, stating that he had previously increased, among others, the salary of said Jackson, "topographical draughtsman," from $1,500 to $1,800 per annum, and requesting that a resolution be adopted approving his action. On the 30th day of the same month, he wrote said board, referring to his former letter recommending that the grade of "draughtsman" at $1,950 per annum be established, and stating that the promo-

tions desired to be made were part of a general plan of promotion in his department, and that the duties of the employés in the main office thereof had greatly increased due to reasons stated by him therein, but that there had been no increase in the office force, and that "the work has been kept well in hand by them and is up to date, and I assure you that the promotions sought to be made are merited by the individuals to be advanced"; and in this letter he requested the board of estimate and apportionment to pass a resolution recommending to the board of aldermen that the grade, among the others included in his first letter, of "draughtsman," be established at $1,950 per annum. The board of estimate and apportionment having failed to act upon these recommendations, the commissioner of bridges, on the 8th day of May, 1903, addressed another letter to it supplementing his previous letters, and recommended the increases which he had previously recommended for the positions of "draughtsman" and "topographical draughtsman"; and thereafter the resolution of June 2, 1903, was adopted by the board of aldermen on the recommendation of the board of estimate and apportionment.

Prior thereto, and on the 30th day of April, 1902, the board of estimate and apportionment adopted a resolution fixing salaries of King and Lingerman in the department of bridges at $1,800 per annum, and of Jackson in the same department at $1,500 per annum, and of one Wilkins, also in the same department, at $2,700 per annum; and each of them was designated in the resolution "draughtsman." At that time rule 37 of the Civil Service Rules and Classification graded positions in the competitive class of the municipal service according to the "fixed limit of compensation"; and there appeared therein the following:

"Fourth Grade Draughtsman. Annual compensation of more than $1,320, but not more than $1,800."

And in "Appendix I," under the heading "Department of Bridges," the following appeared:

"Competitive Class.
"Schedule D.
"Part I.
"Draughtsman."

It was stipulated that neither King nor Lingerman, the two draughtsmen in the department of bridges at the time the resolution of 1903 was adopted, and for whose benefit it evidently was adopted, ever passed a qualifying examination for promotion in that department, and that Jackson did not, but that he was in fact promoted to the increased salary as topographical draughtsman and thus received the same as they received.

When King was originally appointed, the Civil Service Regulations classified in the "Fourth Grade" the following positions: "Draughtsman, general, $1,800.00. Draughtsman, architectural or mechanical, $1,800.00. Draughtsman, topographical, $1,800.00." And in the "Fifth Grade" appeared, "Draughtsman, chief, $2,000.00"; and there was also, under the heading "Department of Bridges," a position designated "Draughtsman," with no salary specified.

The Civil Service Rules and Classification in force at the time the resolution, upon which the plaintiff bases his claim, was adopted, graded the competitive class "based upon the relative character of the duties performed and the rates of annual compensation"; and under "Schedule D" the following grades were specified:

"Grade VIII.—Offices or position having an annual compensation of $1,800.
"Grade IX.—Offices or positions having an annual compensation of $1,950."

And the positions so graded were shown as follows:

"Subdivision I.—Civil Engineering. Topographical Draughtsman. Structural Steel Draughtsman."
"Subdivision IV.—Mechanical Engineering. Mechanical Draughtsman."
"Subdivision VI.—Architectural. Architectural Draughtsman."

It was stipulated that the Civil Service Commission never established an eligible list for any position "specifically described as draughtsman from which persons were appointed in the department of bridges except a list established in 1899," and that it has never held an examination for a position specifically designated "draughtsman" pursuant to which persons were appointed to the department of bridges since 1899.

After the adoption of the resolution fixing the salary of "draughtsman" in the department of bridges at $1,950 per annum, the first eligible list of any character, "except topographical," from which appointments were made to the department of bridges, was established by the Civil Service Commission on the 5th day of April, 1904, and it was designated "architectural draughtsman (structural steel)." There were five men, among others, whose names were placed on that list, and who were subsequently appointed and employed in the department of bridges. Of them, one Golding was appointed as architectural draughtsman to the department of education, and was transferred to the department of bridges as "draughtsman"; one Carman was appointed to the position of architectural draughtsman in the department of bridges; one Brown, who took an examination for architectural draughtsman, was appointed to the position of structural steel draughtsman in the department of bridges; one Joachimson was appointed as architectural draughtsman; and one Vroman was appointed as structural steel draughtsman, although he, also, took an examination for architectural draughtsman. The request sent to the civil service by the then commissioner of bridges for the certification of an eligible list from which appointments of four draughtsmen in the department of bridges might be made, and which led to the appointment of Carman, Brown, Joachimson, and Vroman, was as follows:

"Please certify an eligible list from which I may appoint in the department of bridges four draughtsmen, with knowledge of structural steel, at $1,500 per annum."

All of the five appointees above mentioned were described on the payrolls of the department of bridges, during the terms of their respective employments as draughtsmen, and their names were certified upon said payrolls by the Civil Service Commission under that designation during the same periods.

The next eligible list relating to the position of draughtsman, from which appointments were made in the department of bridges, was established June 6, 1905, and it was designated "Structural Steel Draüghtsmen," and lists similarly designated were subsequently established. All persons appointed to any position embodying the word draughtsman in its designation in the department of bridges after June 6, 1905, were taken either from the eligible list entitled "Structural Steel Draughtsmen," or the list entitled "Topographical Draughtsmen"; and, after the adoption ·of said resolution fixing the salary of "draughtsman" at $1,950 per annum, there have been 48 appointments in the department of bridges to positions as "structural steel draughtsmen." There were also civil service examinations, after the adoption of said resolution, for the positioñs of "Mechanical draughtsman, architectural draughtsman and. draughtsman's helper"; but no· appointment was made in the department of bridges from the eligible lists for said positions. The plaintiff was originally appointed in the department of bridges from an eligible list entitled "structural steel draughtsman."

Prior to the 4th day of December, 1903, the .position of draughtsman in the municipal civil service subject to competitive examination was graded according to salary; but · after that date and until the month of December, 1909, which includes the time when the plaintiff was appointed, the grading according to salary was omitted; but it does not appear what change, if any, in that regard was made in the month of December, 1909. At the time that plaintiff waś originally appointed, the Civil Service Rules and Classification, under. the heading "Part VII.—The Engineering Service," contained the. following:

"Grade 1.—Draughtsman's helper.
"Grade 2.—Draughtsman.    (1). Topographical.    (2) Structural steel.    (3) Taxes and assessments."
"Grade 5.—Chief draughtsman."

Before appointing the plaintiff, and on the 29th day of April, 1907, the commissioner of bridges reqüested, by a communication in writing, the Civil Service Commission to "certify an eligible list from which I may . appoint in the department of bridges, twenty structural steel draughtsmen at $1,800 per annum." The list furnished by the commission is not given; but it appears by a letter from the deputy and acting commissioner of bridges to the commission under date of May 3, 1907, that 17 persons · certified by the commission, including the plaintiff, had been .appointed as structural steel draughtsmen to the department of bridges at $1,800 per annum, to date from May 1, 1907; and by a letter dated May 1, 1907, the deputy and acting commissioner of bridges notified the plaintiff of his appointment "as a structural steel draughtsman in the department of bridges," and the letter stated, "Your compensation is fixed at $1,800 per annum." The reappointment or reassignment of the plaintiff to duty on the 16th day of October, 1911, is to the same effect. The work performed by the plaintiff was "Engineering drafting, architectural drafting, mechanical drafting, structural steel drafting, topographical drafting, and railroad drafting." Since the adoption of the resolution of June 2, 1903, fixing the salary

of the position of "draughtsman" in the department of bridges at $1,950 per annum, none of the appointees to the positions of architectural or structural steel draughtsmen received a salary of $1,950 per annum; but they all received salaries at the rates of $1,500 and $1,800 per annum and have all been carried on the pay rolls as "draughtsmen."

By section 226 of the Greater New York Charter, it is the duty of the head of each department annually, not later than September 10th, to send to the board of estimate and apportionment an estimate in writing, known as a "departmental estimate," of the amount of expenditure, specifying in detail the objects thereof, required in his department, and including a statement of each of the salaries of the officers, clerks, employés, and subordinates thereof; and it is provided that duplicates of the departmental estimates shall be sent at the same time to the board of aldermen. These departmental estimates are required to be sent to the board of estimate and apportionment to enable said board to prepare a budget of the amounts estimated to be required to defray the expenses of conducting the public business of the city for the ensuing year. By said section 226 of the Greater New York Charter, it is provided that, after the budget is prepared or made by the board of estimate and apportionment, it shall, within five days, be submitted to the board of aldermen, and shall simultaneously be published in the City Record, which by section 1526 of the Charter is made one of the official newspapers of the municipal corporation; and it is the duty of the board of aldermen to pass upon the same within 20 days. It is further provided therein that the budget as finally adopted shall be filed in the office of the Comptroller and published in the City Record on or before December 31st.

Prior to the Charter revision in 1901, it was provided that the "number and duties of all officers, clerks, employés and subordinates in every department," excepting as therein otherwise specially provided, "with their respective salaries," whether then fixed by special law or otherwise, should be such as the heads of the respective departments should "designate and approve," subject to the revision of the board of estimate and apportionment (Laws of 1897, c. 378, § 1543), and the power to fix such salaries was also given to the municipal assembly upon the recommendation of the board of estimate and apportionment (Laws of 1897, c. 378, § 56). By said revision of 1901 (Laws of 1901, c. 466), section 56 of the Charter, as it then existed, was amended so as to make it the duty of the board of aldermen, upon the recommendation of the board of estimate and apportionment, to "fix the salary of every officer or person whose compensation is paid out of the city treasury other than day laborers, and teachers, examiners and members of the supervising staff of the department of education"; and said section 1543 of the Charter was amended by omitting the provision conferring upon the heads of departments authority with respect to fixing salaries, and by inserting therein a provision to the effect that such salaries shall be as fixed by the board of aldermen upon the recommendation of the board of estimate and apportionment as provided in the charter. By chapter 436 of the Laws of 1902,

section 10 of the Charter was amended so as to vest in the board of estimate and apportionment, among other things, the power to fix all salaries between January 1 and May 1, 1902, upon the recommendation of the mayor and other designated officers; and by chapter 435 of the Laws of the same year, which took effect on the same day (April 8, 1902), said section 56 was again amended so as to conform to the amendment of said section 10 by providing that all salaries as fixed on January 1, 1902, shall continue in force until fixed by the board of aldermen pursuant to section 56, except as may be otherwise determined by the board of estimate and apportionment prior to May 1, 1902, under the provisions of said section 10. See Peo. ex rel. Stokes v. Tully, 108 App. Div. 345, 95 N. Y. Supp. 916, 1153.

The provisions made by the annual estimates or otherwise for salary for the positions of structural steel draughtsmen was not proved, but it is fairly to be inferred, from the action of the commissioner of bridges in appointing the plaintiff at $1,800 per annum, that that was the salary or compensation for which provision had been made at the time; and, from continuing plaintiff on the pay roll thereafter at that rate and from his receipting for his salary or compensation at that rate ever since in accordance with the requirements of section 149 of the Charter, it is to be presumed that provision was made for payment of salary or compensation only at that rate. This point has not been taken by counsel for the appellant, but we think that it is fairly presented by the record and should be deemed controlling in this class of cases. Doubtless it was not within the province of the commissioner of bridges to fix the compensation of this position, at least not unless it was a temporary employment in the execution of a public contract the expense of which was to be borne by the sale of corporate stock (see sections 169 to 188 of the Charter), in which case the relation would be clearly contractual; but it was within the province of the board of aldermen on the recommendation of the board of estimate and apportionment to reduce the salary thereof, and it was within the province of the commissioner of bridges to determine in the first instance how many draughtsmen he required, and it was also his duty to refrain from incurring a liability against the city in an amount greater than that for which provision had been made in the estimates or otherwise. Greater New York Charter, § 1542.

The position of draughtsman was not a public office, which the commissioner of bridges was required to fill. It was merely a position in the public service which he was authorized, with the approval of the board of estimate and apportionment, to fill, provided provision had been made in the estimates or otherwise for payment of the salary or compensation; and plaintiff was only entitled to the salary during the time he actually worked (Greater New York Charter, § 1543), and, if wrongfully removed, the same rule would have applied with respect to obtaining other employment to reduce damages as in the ordinary case of master and servant (Sutliffe v. City of New York, 132 App. Div. 831, 117 N. Y. Supp. 813). The plaintiff was under no obligation to accept the appointment, and it was entirely competent, in the circumstances disclosed by this record, for him to accept it on the

condition, with respect to the amount of compensation, offered by the commissioner of bridges; and when he did so accept it and receive and receipt for the salary or compensation at $1,800 per annum he has no further claim against the city and cannot be heard to contend that the salary was more.

[2] While ordinarily, as we held in Peo. ex rel. Collins v. Ahearn, 120 App. Div. 95, 104 N. Y. Supp. 860, the action of the board of aldermen in passing upon the annual estimates is not legislative, yet on the facts here presented, while it was the duty of the board of estimate and apportionment and board of aldermen to provide in the annual estimates for the salaries and compensation fixed by the Constitution or by statute and for the salaries and compensation fixed by their joint action which they intended to continue, and they were not confined to any particular form or procedure in refixing salaries, it was, I think, within their province, by the annual estimates, to reduce salaries which it was within their authority to fix. It is a reasonable construction of the annual recommendation of the board of estimate and apportionment in submitting estimates to the board of aldermen, in and by which it recommends the raising of funds by taxation for the purpose of paying salaries or the compensation of positions at a rate lower than that theretofore prescribed, that it constitutes a recommendation to the board of aldermen for the reduction of such salaries or compensation; and on such recommendation receiving the approval of the board of aldermen I am of opinion that the salary or compensation is reduced accordingly.

[3] But if a formal resolution were required to reduce the salary, employés accepting and receipting for the reduced salary provided for in the estimates cannot thereafter complain, for, had they timely objected, more formal action might have been, and probably would have been, taken. It would be most unjust to the city to require it to pay the arrears, when if the claim had been promptly made the city could have avoided the liability. The fact that plaintiff did not know that the resolution fixing a higher salary had been passed is no answer to this argument. He should have known what he intended to claim. He knew that the city intended to pay him only $1,800 per annum, and evidently he was quite satisfied to accept and acquiesce at the time.

In Peo. ex rel. Bacon v. Board of Supervisors, 105 N. Y. 180, 11 N. E. 391—not cited by either party—where the salary of the chief clerk in the office of the district attorney of the county of Kings had been duly fixed by the board of supervisors at $3,000 per annum, it was held that the action of the board of supervisors in fixing the amount to be raised by taxation for salaries in the office of the district attorney by a gross amount for the current fiscal year at a sum considerably less than the aggregate of the salaries of the various positions in the office as previously fixed, constituted a reduction of the salaries, and that the chief clerk appointed by the district attorney, who had no authority to fix his compensation, on the understanding that he was to receive only $1,500 per annum, instead of the salary theretofore fixed at twice that amount, was bound thereby, and that, having accepted the salary at the reduced rate without claim for extra

compensation until after the termination of his employment, he could not recover the difference between the salary as previously fixed and the amount so received. In that case, one argument advanced by the court in support of the decision was that, if he had protested, the board of supervisors might by formal action have reduced the salary.

The same argument applies with equal force here. It may fairly be presumed that the members of the board of estimate and apportionment and of the board of aldermen were aware of their prior action in fixing the salary at $1,950 per annum, and that they intended, as their action indicates, that that salary was merely for the benefit of the two experienced draughtsmen in the service at the time, who were to be promoted, but who evidently failed to pass the civil service examination to entitle them to promotion. It is unreasonable to infer that the members of the board of estimate and apportionment and of the board of aldermen were not well aware of the fact that, in providing in the annual estimates or otherwise for the salaries of these positions at $1,800 per annum, they were providing for a lower salary than had been previously prescribed by the resolution. It is therefore manifest, either that they intended that the resolution should apply only to the two employés who were to be promoted, as claimed in behalf of the city, or that they intended to reduce the salary of the position to $1,800 per annum. The fact that the plaintiff and others were not appointed to positions as "draughtsman," but as "structura' steel draughtsman," or by other designations, tends to sustain the former view; but, as the learned counsel for the respondent argues, the fact that they were all designated as draughtsmen on the pay rolls and that no distinction was made between the work of a draughtsman and that of a structural steel draughtsman materially weakens that theory.

In the circumstances, however, the plaintiff is too late to expect a liberal construction of the resolution, for he has acquiesced to the prejudice of the city in its understanding with respect to the salary to which he was entitled, and it should now be held that the only manner in which his salary was fixed was by the annual estimates or other provision for the payment thereof at the rate of $1,800 per annum which he has received in full; for, having been appointed to the position of "structural steel draughtsman," and having accepted the salary annually raised by taxation or otherwise for his position by the municipal authorities, he should not now be heard to claim that he is entitled to a greater salary which was specifically fixed for another position. As I view the case, it is not necessary to discuss or to distinguish the various authorities cited, such as Moore v. Board of Education, 121 App. Div. 862, 106 N. Y. Supp. 983, in which it has been held that it is not competent for an officer who is not clothed with the authority to fix a salary to contract with an appointee to accept less than the salary prescribed by statute, or by other authority, for, as contended by the learned counsel for the appellant, the facts of this case clearly distinguish it from them without argument, and render the reasoning of authorities, such as Ryan v. City of New York, 177 N. Y. 271, 69 N. E. 599, Clark v. State, 142 N. Y. 101, 36 N. E. 817, and Byrnes v. City of New York, 150 App. Div. 338, 134 N. Y. Supp. 759, in

148 N.Y.S.—52

which it was held that a state or municipal employé entitled to a minimum rate of wages by accepting employment at a specified rate which was less than such minimum and accepting pay at that rate waived any claim to greater compensation, and Farrell v. City. of Buffalo, 118 App. Div. 597, 103 N. Y. Supp. 340, in which it was held that accepting and receipting in full for wages at a specified rate constituted a waiver of any right to wages at a higher rate for services performed as foreman, more in point.

It follows that the determination of the Appellate Term should be reversed, with costs, and the judgment of the Municipal Court reversed, and the complaint dismissed, with costs to appellant.

INGRAHAM, P. J., and McLAUGHLIN and CLARKE, JJ., concur. SCOTT, J., concurs in result on authority of Bacon v. Board of Supervisors, 105 N. Y. 180, 11 N. E. 391.